UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| THEODORE J. SOPKO, | * | CHAPTER 7 |
| Debtor | * | |
| | * | Case No. 1-04-06133 |
| RAYMOND E. DIEHL and | * | |
| GENEVIEVE DIEHL, | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Adv. No. 1-05-00045 |
| | * | |
| THEODORE J. SOPKO, | * | |
| Defendant | * | |

## MEMORANDUM OPINION

This matter is before the Court on the Complaint filed by Raymond Diehl and Genevieve Diehl (the "Diehls" or "Plaintiffs") on August 1, 2006 objecting the discharge of Theodore J. Sopko ("Sopko" or the "Debtor") . The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is core pursuant to 28 U.S.C. § 157(b)(2)(A) and (J).[1] For the reasons stated below, the Court overrules Plaintiffs' § 523(a)(2) objections and sustains Plaintiffs' § 727(a)(3) objection.

### Procedural History

On October 12, 2004, Sopko filed a voluntary petition for bankruptcy under chapter 7 of the Bankruptcy Code. On March 18, 2005, the Diehls filed a Complaint objecting to the Debtor's discharge (the "Complaint"). After the Court denied the Diehls' Motion for Summary Judgment on September 19, 2005, a hearing was held on December 1, 2005. Plaintiffs allege

---

[1]This Memorandum Opinion constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

that Debtor secured a business loan from them under false pretenses or actual fraud and failed to repay a substantial portion of the loans. Therefore, Plaintiffs argue, their claim should be found to be nondischargeable pursuant to § 523(a)(2).

Prior to the petition date, Plaintiffs confessed judgment in the amount of $700,542.58 on Debtor's note and initiated discovery in aid of execution. Plaintiffs allege that Debtor failed to produce certain business-related documents in response to their discovery request. Based on this allegation, Plaintiffs also assert that Debtor's discharge should be denied pursuant to § 727(a)(3) because he concealed, destroyed or failed to keep or preserve documents from which his financial condition or business transactions might be ascertained. The matter is fully briefed and ripe for decision.

## Factual Findings

Debtor became a car salesman in 1984 and opened his first dealership in 1989. In 1993 Debtor owned and operated Sopko Auto Sales and Locator (the "Dealership") as a sole proprietor. Plaintiffs were introduced to Debtor that same year by Bob Parks ("Parks"), an accountant who prepared tax forms for both parties. The Diehls had known Parks for approximately 15 years, and he was aware that they had made numerous home mortgage loans to other parties in connection with Mr. Diehl's home construction business. At their initial meeting in 1993, the Diehls agreed to loan Debtor $17,000 at 12% interest, evidenced by a promissory note, to purchase inventory for the Dealership[2] During this meeting Debtor stated that the funds

---

[2]Debtor referred to the advancements from the Diehls as a "line of credit." A typical line of credit involves a series of borrowings with a fixed limit on the total amount loaned. The arrangement between Debtor and the Diehls more closely resembled a series of individual loans in which the remaining principal balance on a prior loan was incorporated into a new extension of credit. Between August 1993 and May 1999, the Diehls loaned Debtor $582,600.00.

-2-

would be used to purchase vehicles. The Diehls neither asked for nor obtained an interest in collateral to secure the loans. Between 1993 and 1999, the Diehls made a series of loans to Debtor (collectively, the "Loans"). Each time the Diehls advanced funds, a new promissory note was drafted by Mrs. Diehl, and the prior note was destroyed. Debtor made interest payments on the amounts borrowed monthly and occasionally made payments to reduce principal.

The parties first met to discuss their business relationship at the Diehls' home, and Debtor personally delivered payments to their residence, usually each month. Debtor often would arrive at the Diehl home in a late model car, which he told Plaintiffs was purchased from an auto auction or from Canada. As part of his visit, Debtor would report to the Diehls on the status of car sales and the business generally.

Between 1996 and 1999, Debtor's business activities underwent several changes. In 1996 Debtor began a horse racing partnership, referred to as Stevark & Wheels ("S&W"), with Bruce Kravets, a trainer at Penn National Raceway ("Penn National"). Between 1996 and 1999, S&W acquired several horses, which they raced at Penn National and at racetracks in Philadelphia and Charles Town, West Virginia. During this period, the Dealership remained in business, but in 1998 the dealership license was placed in the name of Debtor's father, Joseph Sopko, after Debtor's motor vehicle sales license and dealership license were suspended by the Pennsylvania Department of State, Bureau of Vehicle Manufacturers, Dealers and Salespersons (the "Bureau"). According to a consent order entered into by Debtor and the Bureau, Debtor's

---

Between November 1993 and August 2000, he repaid the Diehls $190,100 in principal. Between September 1993 and October 2000, he paid interest of $224,110.06 on the funds borrowed.

-3-

license was suspended for warranty sticker violations and odometer tampering. During the same year, the Dealership relocated to a leased property, and the Debtor began renovations on the building.

At various times between 1993 and 1999, Plaintiffs heard rumors that Debtor gambled, which sparked concern about his intention to repay the loans. However, despite their misgivings, based upon assurances from Parks and their own inclination to trust Debtor, they continued to extend additional loans without obtaining substantial repayment of principal or a security interest in collateral. On May 3, 1999, the Diehls issued their last loan to the Debtor. On August 17, 2000, at the Diehls' request, Debtor signed a judgment note with a confession of judgment. He made three principal payments in August 2000 and continued to make interest payments until March 2001. In 2004, the Diehls confessed judgment on the note against Debtor in the principal amount of $424,500.00, plus costs, fees and interest, for a total judgment in the amount of $700,542.58.

Less than two months before Debtor filed his petition, the Diehls sought discovery of Debtor's business records and other information pertaining to the expenditure of the proceeds of the Loan in connection with execution on the judgment note. Debtor did not respond to the discovery request. At Debtor's creditors' meeting on November 19, 2004, the Trustee requested Debtor to produce business documents for the period 1993 through 2004. Debtor partially responded to the request and an order compelling production was later issued by the Court. In March 2005, the Diehls filed the within Complaint.

## Discussion

The Diehls' Complaint includes two counts. In Count I, Plaintiffs assert that their claim

-4-

should be found nondischargeable under § 523(a)(2) because the Loans were obtained through false pretenses, false representations, or actual fraud. In Count II, the Diehls assert that Debtor's discharge should be denied pursuant to § 727(a)(3) because he unjustifiably destroyed or failed to preserve records by which his financial condition and material business transactions could be ascertained.

When deciding a discharge issue, a bankruptcy court must consider the Bankruptcy Code's emphasis on providing debtors with a fresh start. Statutory exceptions are to be interpreted narrowly in favor of the debtor. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *In re Pelkowski*, 990 F.2d 737, 744 (3d Cir. 1993). A "[d]ischarge is not a right, however, but a privilege which is granted to debtors in appropriate circumstances." *In re Szafranski*, 147 B.R. 976, 980 (Bankr. N.D. Okla. 1992). "The primary objective of bankruptcy is the reconciliation of rights between creditors and 'honest but unfortunate debtors.'" *Freeman v. Rodgers (In re Rodgers),* 1993 WL 393071 (Bankr. W.D. Pa 1993) *(citing In re Szafranski*, 147 B.R. at 980). "Where a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors." *Cohen v. De La Cruz ( In re Cohen),* 106 F.3d 52, 59 (3d Cir. 1997), *aff'd* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (quoted in *In re DeBaggis* 247 B.R. 383, 388 (Bankr. D.N.J. 1999)).

    *a.    Section 523(a)(2)*

Section 523(a)(2) prohibits the discharge of debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by – false pretenses, a false representation or actual fraud." 11 USC § 523(a)(2)(A). Courts examining debts for nondischargeability under this section have required proof of the following facts: (1) that debtor

-5-

made a false representation; (2) that debtor knew at the time the representation was made that it was false; (3) that the representation was made with intent to deceive the creditor; (4) that the creditor reasonably relied on the representation; (5) that the creditor sustained injury as a proximate result of the making of the representation; and (6) that debtor obtained – either directly or indirectly – property, services, or extension, renewal, or refinancing of credit. *In re Verhelst,* 170 B.R. 657, 660 (Bankr. W.D. Ark. 1993); *In re Fritz,* 88 B.R. 434, 435 (Bankr. S.D. Fla. 1988)). *See also In re Young,* 91 F.3d 1367, 1373 (10th Cir. 1996); *In re Rossiter*, 2002 WL 31987288, *1 (Bankr. E.D. Pa. 2002). "Reliance upon the misrepresentation need not be reasonable, but merely justifiable." *Field v. Mans*, 516 U.S. 59, 116 S. Ct 437, 133 L.Ed. 2d 351, 33 C.B.C.2d 1323 (1995). The non-dischargeability of a debt must be established by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct 654, 659 (1991).

It is undisputed that Debtor obtained a significant extension of credit from the Diehls over a six-year period. However, the remaining elements required to establish the nondischargeability of the Loans are contested by the parties.

     i.    <u>The Debtor Made a False Representation</u>

"Typically, [§ 523(a)(2)(A)] requires that a debtor knowingly make a falsehood that involves moral turpitude or an intentional wrong upon which another party relies in surrendering property or money to the debtor." *Rodgers*, 1993 WL 393071, at *4 (internal citations and quotations omitted). A debtor's actual fraud can also trigger a § 523(a)(2) discharge exception. "Actual fraud . . . consists of any deceit, artifice, trick, or design involving direct and active operations of the mind, used to circumvent and cheat another – something said, done, or omitted . . . ." 4 Collier on Bankruptcy, ¶523.08[1][e] (15th ed. rev. 2006). "A debtor's silence regarding

-6-

a material fact can constitute a false representation under section 523(a)(2)(A). A material fact is one touching upon the essence of the transaction." *Id.* "[B]ankruptcy courts have conceded that a debtor's silence or omission regarding a material fact can constitute a false representation which is actionable under § 523(a)(2)(A)." *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089 (9th Cir. 1996). *See also Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 Bankr. 259, 263 (Bankr. N.D. Ill. 1992) ("[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression.")

Plaintiffs assert that Debtor made two misrepresentations to obtain the Loans. First, they contend that Debtor never intended to repay the Loans. The only proof offered to support this assertion is that Debtor filed bankruptcy before paying Plaintiffs in full. "A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting non-discharge." *In re Eashai*, 167 B.R. at 185. For purposes of the fraud exception to discharge under § 523(a)(2), a debtor's subsequent failure to repay credit is, without more, "clearly insufficient" to prove that there was no intent to perform when the loan was received. *In re Murphy*, 190 B.R. 327 (Bankr. N.D. Ill. 1995). Debtor denies that he made any false representations to Plaintiffs. He also denies that he knew at the time the Loans were being made that his representations concerning repayment were false or that he made the representations with the purpose of deceiving the Diehls. Therefore, Plaintiffs failed to meet their burden to prove the Debtor made false representations with regard to his intentions to repay the Loans.

-7-

Case 1:05-ap-00045-MDF    Doc 23    Filed 08/03/06    Entered 08/03/06 15:27:14    Desc
Main Document    Page 7 of 20

Plaintiffs' second contention is that Debtor represented that the Loans would be used for the purchase of inventory for Debtor's car lot and that the funds were used for other purposes. Debtor asserts that it was understood by all parties that the money would be used in the operation of the Dealership, including payment of ordinary expenses of running the business and purchasing used automobiles for sale. Further, he denied making any specific representations that he needed the money to buy cars, rather he argued that the Diehls assumed this was the purpose of the Loans. But Debtor did acknowledge that, under the circumstances of the meeting between Plaintiffs and Debtor, it was a fair assumption that he would purchase inventory with the proceeds of the Loans. Also, Debtor did not deny that he made interest payments by personally delivering the funds to Plaintiffs in vehicles that he represented were being purchased for the business. I find credible the Diehls' statements that they believed that they had an agreement with Debtor that the funds they were loaning to the Dealership would be used to purchase inventory, and for no other purpose.

The Diehls' assertions about the purpose of the Loans is bolstered by evidence presented regarding their refusal to lend monies to Debtor to purchase and renovate a new building. In 1998 and 1999 Debtor spent $80,000.00 on renovating a leased building where he relocated the Dealership. During this same period, Debtor borrowed $100,100.00 from the Diehls and made no repayments of principal. Plaintiffs testified that Debtor discussed with them the possibility of buying or leasing a building and then renovating it as a new location for his Dealership. Both Mr. and Mrs. Diehl testified that they specifically told Debtor that he was not to use the proceeds of the Loans to renovate the new building. Debtor contradicted their testimony stating that Plaintiffs knew about and supported his use of the Loans to finance the renovations. I do not

-8-

find Debtor's testimony on this issue to be credible, and I conclude that Debtor ignored Plaintiffs' directives and used proceeds of the Loans to renovate the new facility in connection with relocating the Dealership.

Additionally, Debtor's silence as to a number of material facts establishes actual fraud. In 1998 Debtor's dealership license was revoked. To enable the business to continue to operate, the Dealership license was transferred to Joseph Sopko, Debtor's father. Debtor failed to disclose either of these significant changes in the business while he continued to obtain additional extensions of credit from the Diehls. He also did not disclose to Plaintiffs that he was responsible for criminal fines totaling $10,000.00 as a result of the loss of his license and that he entered into a consent order to pay civil penalties and restitution of $13,189.00. These fines and penalties were paid from the same account into which the proceeds of the Loans were deposited. Thus, Debtor effectively used the monies loaned by the Diehls for the purpose of purchasing inventory to satisfy these penalties imposed due to his wrongful conduct.

In addition to using the proceeds of the Loans to satisfy penalties and to pay restitution, Debtor also used the proceeds of the Loans in the operation of a new, unrelated business – horse racing. Debtor testified that he had only one bank account in which he deposited the proceeds of the Loans and from which he paid not only the expenses of the Dealership, but also those related to the operations of S&W. In addition, he withdrew funds from the same account for personal uses, including gambling on horse races and frequent golf trips to Hilton Head, South Carolina. In the deposition that was entered as evidence at trial, Debtor stated that no funds from either the Loans or Dealership sales were used for the operations of S&W. However, at trial Debtor

-9-

admitted that he used the Loans to pay the expenses of S&W because income generated by the partnership was insufficient to cover these expenses.[3]

Accordingly, the Court concludes that although Debtor may have intended to use the first extension of credit to purchase inventory, he soon came to view the Diehls as a cash cow to be milked for any venture he wished to pursue. I find that he misrepresented the intended purpose of the Loans, and he failed to disclose material information regarding changes in the business in order to induce the Diehls to make additional extensions of credit. Debtor was well aware that if the Diehls had known that he was using funds to renovate a new leasehold, to fund a horse racing business and to take extravagant vacations, they would have refused to make new loans. The Debtor's representations as to the use of the proceeds of the Loans as well as his silence and omission of material facts clearly establish false representations actionable under § 523(a)(2)(A).

    ii.  <u>Intent to Deceive Creditor</u>

In determining whether a debtor's representations of intent to repay are knowingly false and made with the intent and purpose of deceiving the creditor, a subjective standard is utilized. *Feld, supra,* 203 B.R. at 367. "Intent can be established by circumstantial evidence, and statements made with reckless indifference to the truth are regarded as intentionally false." *In re Unruh,* 278 B.R. 796, 803 (Bankr. D. Minn. 2002). Plaintiffs must establish that Debtor made representations that he knew were false or acted with reckless disregard for the truth. *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995). An intent to defraud can be inferred from a false representation that a debtor uses to induce another to make a loan. *In re Dobek*, 278 B.R. 496,

---

[3]Debtor stated that he covered S&W's expenses with winnings and the sale of horses. The records of the business for 1999 clearly demonstrated, however, that the sources were inadequate to cover the expenses incurred by the partnership during that year.

-10-

507 (Bankr. N.D. Ill. 2002) (intent to deceive found when debtor purchased vehicle for another person when she did not intend to make payments or possess the vehicle).

Debtor paraded vehicles by the Diehls' home when interest checks were delivered to induce them to continue to make new extensions of credit. There is inadequate evidence in the record to determine how the proceeds of the funds received from the Diehls were used between 1993 and 1995, but the testimony demonstrated that Debtor used the loan proceeds to fund other ventures from 1996 until the Diehls finally cut off the spigot in 1999. Debtor admits that he did not disclose material facts to Plaintiffs regarding the Dealership although they had requested Debtor to provide them with financial statements. Further, Debtor was forced to admit that he did not disclose to Plaintiffs that he paid the debts of S&W from the same account into which the proceeds of the Loans had been deposited. He also admitted that he did not disclose to the Diehls that his dealer and vehicle sales licenses were suspended in 1998. Therefore, I find that Plaintiffs have established by a preponderance of the evidence that Debtor intended to deceive the Diehls and to conceal his actual use of the funds.

      iii. <u>Injury Proximate Result of Representation and Creditor Justifiably Relied</u>

Plaintiffs argue that they justifiably relied upon Debtor's statements as to his intended use of the Loans. Plaintiffs must prove that such reliance was justifiable in light of the totality of the circumstances and that as a result of their reliance, they were injured. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field*, 516 U.S. at 71. "Even though justifiable reliance permits a person to rely on a representation of fact although he might have ascertained the falsity of the representation had he

-11-

made an investigation, that person is required to use his sense, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *In re Santos,* 304 B.R. 639, 667 (Bankr. D.N.J. 2004) *(*internal citations and quotations omitted). "[J]ustifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and . . . [i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Field,* 516 U.S. at 71 (internal quotations and citations omitted). "When investigation reveals reasons to be suspicious about the debtor's representations, the creditor should have great difficulty in establishing that the reliance was . . . justifiable." 3 Norton Bankr. L. & Prac. 2d § 47:16.

Establishing the element of reliance is Plaintiffs' most significant hurdle in this case. At trial, Plaintiffs were portrayed as unsophisticated farmers who were duped by Debtor into lending him $582,600.00 over a six-year period.[4] It was disclosed at trial, however, that Mr. Diehl had worked as a contractor and that the Diehls had provided "bridge" loans to customers secured by second mortgages. Therefore, they were familiar with the function of obtaining collateral to secure loans but decided to lend to Debtor on an unsecured basis. Based upon their

---

[4]No evidence was presented that either of the Diehls suffered from any impairment that would prevent them from understanding the transactions that occurred between the parties. Further, there was no allegation of a confidential relationship that would have established that Debtor owed a fiduciary duty to the Diehls.

-12-

own testimony, the decision to lend money to Debtor for the Dealership was based primarily on the recommendation of their accountant.[5] Plaintiffs and Debtor had no previous relationship.

Although Plaintiffs were unable to establish when these events occurred, at various times between 1993 and 2000 the Diehls became suspicious about Debtor's financial stability. Plaintiffs testified that they requested Debtor to produce business records and to provide collateral to secure the loans. Debtor never complied with these requests, but Plaintiffs continued to extend additional funds. Additionally, Mr. Diehl testified that later in the course of the loan relationship, he would drive to the Dealership to check on the inventory, but found few vehicles on the lot. He further testified that in response to his inquiries about inventory, Debtor always told him that the vehicles were on another lot. The Diehls also assert that they relied not only on Parks' initial recommendation, but also on the reassurances he offered when the Diehls began to question Debtor's creditworthiness. Mr. Diehl testified that after he because suspicious that Debtor was gambling, he approached Parks regarding the issue. According to Mr. Diehl, Parks assured him that Debtor was "on the up and up." Mrs. Diehl testified that she and her husband continued to trust Debtor based on Parks' assurances.

Debtor's monthly interest payments and Parks' representation initially may have justified their reliance. After all, during the period from August 1993 through December 1995, Plaintiffs were receiving interest payments on $256,500.00 in loans at 12%. Further, during the same

---

[5]At Parks' suggestion, Debtor contacted Plaintiffs about financing his business. However, based upon Mr. Diehl's testimony, he first was hesitant to do business with Debtor. When asked how the relationship began, Mr. Diehl stated "Bob Parks proposed to me if I was interested in loaning a car dealer some money and he told me about Ted [Debtor]. And then he saw me later and asked me if Ted could contact me and I said no. And he said, well, he'll talk to Ted. And then Ted called up and he came up and he met us. That was in August, I believe of that year [1993]."

-13-

period, Debtor repaid $146,500.00 in principal.  Between 1996 and 1999, after Debtor began his horse racing business and began to incur additional debt related to the relocation of the Dealership, principal payments were made less frequently. When they began to question Debtor's use of the loan proceeds and his intent to repay the obligation, it was incumbent upon the Diehls to investigate Debtor's financial situation.  *Field*, 516 U.S. at 71.  Plaintiffs had numerous reasons for suspicion and were suspicious, simply questioning Parks was insufficient. *Id.* ([If the creditor] has discovered something which should serve as a warning that he is being deceived, he is required to make an investigation.)  Debtor's missing inventory and his refusal to supply  collateral for the loan or to produce business records provided adequate warning that he was either unwilling or unable to perform under the parties' agreement.  Further investigation would have revealed Debtor's misrepresentations.  "Where a creditor ignores 'red flags' and fails to investigate warning signs that should arouse suspicion, reliance on the . . . alleged implicit misrepresentation is unjustifiable." *In re Straughter,* 219 B.R. 672, 675 (Bankr. E.D. Pa. 1998) (internal citations and quotations omitted).

      When the first loan was made, Plaintiffs were justified in relying on Debtor's representation that the loan proceeds were being used to purchase inventory for the Dealership. But there is no proof that Debtor misrepresented his use of the funds at the inception of their business relationship.  Later, Plaintiffs were placed on notice that Debtor may have been using the funds for purposes not intended in the initial agreement.  At that point, clearly they could not justifiably rely on earlier representations when they made new extensions of credit.  Between these two scenarios, the first, when Debtor apparently was using the Loans for their intended purpose and, the second, when Plaintiffs were suspicious of Debtor's activities and should have

-14-

undertaken an investigation before lending Debtor additional monies, the Diehls may have justifiably relied on Debtor's representations at the same time he was using the funds for fraudulent purposes. But the Diehls have failed to establish the temporal parameters for this period and cannot relate particular loans to specific wrongful actions by Debtor. Therefore, Plaintiffs have failed to meet their burden on this element, and the Court is unable to find that the Diehls justifiably relied on Debtor's misrepresentations.

    *b.*    *Section 727(a)(3)*

Plaintiffs also assert that Debtor's discharge should be denied pursuant to § 727(a)(3) because he unjustifiably destroyed or failed to preserve records from which his business transactions might be ascertained. "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy." *In re Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997). Section 727(a)(3) provides:

> The court shall grant the debtor a discharge, unless—the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). "A creditor objecting to a discharge under section 727(a)(3) has the initial burden of proving that '(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.'" *Buzzelli v. PNC Bank (In re Buzzelli)*, 246 B.R. 73, 95 (Bankr. W.D. Pa. 2000) (citing *Meridian Bank v. Alten*, 956 F.2d 1226, 1232 (3rd Cir. 1992)). The plaintiff must meet this burden of persuasion by a preponderance of the evidence, and intent is not a factor. *Id.* at 96. The test for determining the adequacy of the debtor's records is not

-15-

whether the debtor could determine his business circumstances, but rather whether a third-party could determine the debtor's financial condition and business transactions from the records provided. *Buzzelli*, 246 B.R. at 97. "Furthermore, a debtor's records must be such that 'creditors . . . [need] not be forced to undertake an independent investigation of a debtor's affairs.'" *Id.* (internal citations and quotations omitted). "If the creditor makes such a showing, the burden thereafter lies with the debtor to provide justification for the inadequacy." *Heinecke v. Ryan (In re Ryan)*, 285 B.R. 624, 631 (Bankr. W.D. Pa. 2002) (citing *Meridian Bank*, 958 F.2d at 1233).

> The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor in his business; and any other circumstances that should be considered in the interest of justice.

*Meridian Bank*, 958 F.2d at 1231 (citing *In re Wilson*, 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983)). Other factors considered include: the customary business practices for record keeping in the debtor's type of business; whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; and the degree of accuracy disclosed by the debtor's existing books and records. *Swartz v. Goodman (In re Goodman)*, 227 B.R. 626, 631 (Bankr. E.D. Pa. 1998). "The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances." *Buzzelli*, 246 B.R. at 97 (internal citations omitted). As justification for his or her failure to maintain and preserve adequate records, " a debtor cannot assert an honest belief that he or she did not need to keep the records." *Id.* at 98 (quoting *In re Pulos*, 168 B.R. 682, 692 (Bankr. D. Minn. 1994)).

-16-

The Order entered January 11, 2005, upon Plaintiff's Motion to Compel, directed Debtor to produce records describing how the monies loaned by the Diehls to Debtor over a six-year period were used. The documents to be produced included: all books, ledgers, and journals since 1993; all checking accounts, bank statements, cancelled checks, savings accounts, deposit accounts, investment accounts, credit card accounts, all records of investments, retirement funds, real property acquisition or sales; and any other personal or business records for any and all businesses owned by the Debtor either individually or jointly, or to which he had some interest from 1993 to the present. Debtor failed to fully comply with the Order. The records produced for the period of 1993 through 1998 were sketchy and inadequate to determine Debtor's financial condition. Debtor testified that he maintained an inventory of vehicles acquired and sold, as well as balance sheets and profit and loss statements on each vehicle purchased. Additionally, the Debtor stated that he personally reviewed the bank statements from the business and reconciled them on a monthly basis and that he kept all returned checks. Very few of these documents were produced. None of the monthly business journals maintained for the business and only one business ledger from 1996 were produced. For the period 1993 through 1998, the records produced included a 1995 tax statement from Atlantic Mortgage, a receipt from Fasig-Tipton Thoroughbred Auctions for the purchase of two horses in 1998, and taxes returns from 1994 through 1998. Also provided were some tax worksheets and estimated taxes; a few personal bank statements; and notes of 1994 yearly figures for cars bought and sold.[6] None of the records produced would enable a third party to determine Debtor's business transactions during this

---

[6] A number of other records were produced, but it is unclear to which periods they pertain.

period. The business records produced by Debtor were "chaotic or incomplete" and did not allow for "intelligent inquiry" into Debtor's financial affairs. *See Meridian Bank*, 958 F.2d at 1230 (citing *In re Cox*, 904 F.2d 1399, 1401 (9th Cir. 1990)).

"Section 727(a)(3) is intended to allow creditors and/or the trustee to examine the debtor's financial condition and determine what has passed through a debtor's hands." *WTHW Inv. Builders. V. Dias (In re Dias)*, 95 B.R. 419, 422 (Bankr. N.D. Tex. 1988). Debtor's records from 1999 through 2004 are more extensive than those provided for the prior period, but they still do not permit a party to determine, in even a general manner, Debtor's income and expenses. Business records produced for this period include: a 1999 account summary for Penn National; a number of business receipts from 1999; approximately 40 copies of checks written between 1999 and 2000; four receipts for horse training and other expenses from 1999; a 2000 invoice from Stevark Stable; and one money receipt from 2000.

The circumstances of the instant case require more complete records. Debtor operated at least two businesses from 1996 through 2001 and maintained one checking account for all business-related expenses. Both horse racing and motor vehicle sales are regulated businesses that demand certain levels of accountability. In his defense, Debtor testified that he had no more than one or two employees at one time and, though initially he collected withholding taxes, he later required his employees to handle their own taxes. He also offered testimony that Plaintiffs were the only major creditor of the Dealership.

Debtor's excuses for failing to maintain adequate records are lame. Sopko is a college-educated businessman who had nearly a decade of experience in motor vehicle sales before he approached the Diehls for financing. It is not unreasonable for Plaintiffs or this Court to expect

-18-

that Debtor would be able to produce more complete records for the relevant periods. Plaintiffs cannot ascertain from the documents produced where the loan funds were deposited and how they were used. As an excuse for his failure to maintain adequate records, Debtor argues that he had few debts and that the Diehls were his primary creditors. This explanation does not aid his defense, however. To the contrary, it illustrates that Debtor's funding sources were not complex and that he should have been able to provide the requested documentation.

Debtor's failure to maintain an accounting for the disposition of approximately $582,600.00 in loan proceeds is not acceptable. Plaintiffs have met their burden and, therefore, it is the Debtor's responsibility to prove that he was justified in failing to maintain records for the periods in question. To justify his failure to maintain adequate records Debtor explained that during the Dealership's 1998 relocation and in the normal course of business, he discarded records, keeping only those closest to current. If Debtor had no reason to believe that these records were relevant, this excuse may have possessed some validity. But at no point during the period the Diehls were loaning funds to Debtor did he pay the outstanding principal amount. At the end of 1995, the year in which he made the most significant amount of principal payments, he owed the Diehls $110,000.00 in unpaid principal. There is no justification for failing to maintain records or destroying existing records when Debtor continued to be responsible for a significant unpaid liability. Debtor also asserts that floods caused by Hurricane Floyd destroyed all of Debtor's records, except those for 1999. I find this explanation to be inadequate. Debtor may not have been able to locate original documents related to the Loans or to other financial matters because of the flood, but he had a duty to reconstruct his records or to obtain copies of documents that were available from third parties.

-19-

Debtor also contends that records from 1993 through 1999 were not within the reasonable period required for maintenance of adequate records. *See Ryan*, 285 B.R. at 630 (stating that the standard under § 727(a)(3) is whether "there [is] available written evidence from . . . which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained."). Again, if Debtor had paid off the "line of credit" at any point during the period, it may have been reasonable for him not to preserve records regarding prior periods. Since the Loans were unpaid, records on the use of the proceeds should have been maintained. Even if documents were destroyed by flooding, it is unclear why he did not attempt to reconstruct the loan records. Debtor's arguments simply do not justify his failure to maintain adequate business records.

For all periods in question, the Court finds that Debtor unjustifiably destroyed or failed to preserve business records from which his business transactions might be ascertained. Therefore, Plaintiffs' objection to Debtor's discharge under § 727(a)(3) is sustained.

## **Conclusion**

For the reasons set forth above, the Court will overrule the Plaintiffs' objections to discharge pursuant to § 523(a)(2)(A) and (B) and will sustain the objection to discharge pursuant to § 727(a)(3).

BY THE COURT,

*Mary D. France*
Bankruptcy Judge

Date: August 3, 2006

*This document is electronically signed and filed on the same date.*